# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| OCEANA, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 11-1896 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 36, 37, 38 |
| | : | | |
| PENNY PRITZKER, *in her official capacity as* | : | | |
| *Secretary of the United States Department of* | : | | |
| *Commerce*, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |
| | : | | |
| *and* | : | | |
| | : | | |
| FISHERIES SURVIVAL FUND, | : | | |
| | : | | |
| Intervenor–Defendant. | : | | |

## MEMORANDUM OPINION

**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND
GRANTING INTERVENOR–DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Oceana, Inc. ("Oceana") has filed this suit against Defendants Penny Pritzker, in her official capacity as Secretary of Commerce,[1] the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS") (collectively, "Federal Defendants"). Oceana alleges that the Mid-Atlantic Fishery Management Council Omnibus Amendment to Implement Annual Catch Limits (ACLs) and Accountability Measures (AMs), 76 Fed. Reg. 60,606 (Sept. 29, 2011) (codified at 50 C.F.R. pt. 648 (2013)) (A.R. 5197–

---

[1] Secretary Pritzker is substituted for John Bryson pursuant to Federal Rule of Civil Procedure 25(d).

213) (the "Omnibus Amendment"), violates the Magnuson–Stevens Fishery Conservation and Management Act ("MSA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). The Court has allowed the Fisheries Survival Fund ("FSF") to join the suit as Intervenor–Defendant.

This matter is now before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, the Court denies Oceana's motion for summary judgment and grants Defendants' motions for summary judgment.

## II. BACKGROUND

### A. Statutory Background

#### 1. The Magnuson–Stevens Act

In 1976, in balancing the environmental interests in preventing overfishing and the loss of marine habitat against the often competing economic interests of the United States' fishing industry, Congress enacted the Magnuson–Stevens Fishery Conservation and Management Act, Pub. L. No. 94-265, 90 Stat. 331 (1976) (codified as amended at 16 U.S.C. §§ 1801 *et seq.* (2012)). The MSA established eight regional councils (the "Councils"), which are charged with the duty of drafting fishery management plans ("FMPs") for each fishery under their control. *See* 16 U.S.C. § 1852(a)(1), (h)(1) (2012).

The required components of FMPs are set forth in Section 1853(a) of the MSA. *See id.* § 1853(a). FMPs proposed by the Councils, and any regulations promulgated to implement FMPs, must also be consistent with the MSA's ten "National Standards" for fishery conservation and management. *See id.* § 1851(a). The MSA requires that the Secretary of Commerce establish advisory guidelines (the "Guidelines") to assist in the development of FMPs based on the National Standards, but provides that the Guidelines do not have the force of law. *See id.*

§ 1851(b).  NMFS has promulgated a set of Guidelines interpreting the ten National Standards, and has amended the Guidelines over time to keep pace with various changes to the MSA itself. *See* 50 C.F.R. §§ 600.305–.355 (2013); *see also, e.g.*, NS1 Guidelines Final Rule, 74 Fed. Reg. 3178 (Jan. 16, 2009) (codified as amended at 50 C.F.R. pt. 600 (2013)) (A.R. 102–38) (revising the Guidelines based on the 2007 amendments to the MSA).

In 2007, Congress amended the MSA by enacting the Magnuson–Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (2007) ("MSRA").  The amendment included a new required provision for all FMPs, mandating that FMPs "establish a mechanism for specifying annual catch limits . . . at such a level that overfishing does not occur in the fishery, including measures to ensure accountability." *See id.* sec. 303(a), § 104(a)(10), 120 Stat. at 3584 (codified at 16 U.S.C. § 1853(a)(15)). "Overfishing" is defined in the MSA as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. § 1802(34) (2012).  Maximum sustainable yield ("MSY"), in turn, is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions . . . ."  50 C.F.R. § 600.310(e)(1)(i)(A).  Congress mandated that NMFS comply with the new requirement by fishing year 2010 for fisheries that were subject to overfishing, and by fishing year 2011 for all other fisheries.  *See* MSRA § 104(b), 120 Stat. at 3584 (codified at 16 U.S.C. § 1853 note).

Before bringing the FMPs themselves into compliance with the MSA's new requirements, NMFS first updated the Guidelines to set forth the Secretary's interpretation of the new requirements in light of the National Standards.  Most of the regulations relevant to the instant dispute relate to National Standard 1 ("NS1"), which provides that "[c]onservation and

management measures shall prevent overfishing while achieving, on a continuing basis, optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). Optimum yield ("OY") is defined as the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems . . . ." *Id.* § 1802(33)(A). OY is less than or equal to the MSY. *See* 50 C.F.R. § 600.310(b)(2)(i).

As amended, the NS1 Guidelines set forth an overview of the components the Councils must, should, or may apply in complying with the MSA's new mandate. According to the NS1 Guidelines, the overfishing limit ("OFL") for a given stock is "an estimate of the catch level above which overfishing is occurring." *Id.* § 600.310(e)(2)(i)(D). It is set by first determining the annual *rate* of fishing mortality above which overfishing will occur for a particular stock, known as the maximum fishing mortality threshold ("MFMT"), *see id.* § 600.310(e)(2)(i)(C), and then applying the MFMT to the stock's total size, *see id.* § 600.310(e)(2)(i)(D). To serve the goal of preventing the OFL from being exceeded, the Guidelines provide for the computation of acceptable biological catch ("ABC"), which is a reduced version of the OFL that accounts for scientific uncertainty in the estimation of the OFL. *See id.* § 600.310(f)(2)(ii). "Examples of scientific uncertainty include uncertainty in the estimates of MFMT and biomass." *Id.* § 600.310(f)(1).

At the center of this regime is the annual catch limit ("ACL"), which is a level of annual catch at or below the stock's ABC. *See id.* § 600.310(f)(2)(iv). The ACL is enforced by accountability measures ("AMs"), which are in-season and post-season measures to prevent the ACL from being exceeded, or to initiate corrective measures in the event that ACL is exceeded

in a given fishing year. *See id.* § 600.310(g). FMPs must contain ACLs and AMs for all

managed stocks of fish in the fishery. *See id.* § 600.310(c), (h).

Another important component of fishery management is the problem of "bycatch"—that

is, "fish which are harvested in a fishery, but which are not sold or kept for personal use . . . ."

16 U.S.C. § 1802(2). Under the Sustainable Fisheries Act, Pub. L. No. 104-297, 110 Stat. 3559

(1996), an earlier amendment to the MSA, NMFS was required to "establish a standardized

reporting methodology to assess the amount and type of bycatch occurring in the fishery . . . ."

*Id.* sec. 303(a), § 108(a)(7), 110 Stat. at 3575 (codified at 16 U.S.C. § 1853(a)(11)). NMFS most

recently amended the Northeast region's standardized bycatch reporting methodology in an

omnibus amendment, *see* Northeast Region Standardized Bycatch Reporting Methodology

Omnibus Amendment, 73 Fed. Reg. 4736 (Jan. 28, 2008) (codified at 50 C.F.R. pt. 648 (2013))

(the "SBRM Amendment"), but the D.C. Circuit ordered that the regulation be vacated and

remanded. *See Oceana, Inc. v. Locke*, 670 F.3d 1238 (D.C. Cir. 2011). NMFS is still in the

rulemaking process on remand. *See* Notice and Request for Comments, 78 Fed. Reg. 69,391

(Nov. 19, 2013).

When a Council proposes an FMP or an amendment to an FMP, the proposal is submitted

to the Secretary of Commerce, who must approve, disapprove, or partially approve the proposal.

*See* 16 U.S.C. § 1854(a)(3) (2012). In practice, the Secretary exercises her authority through

NMFS, a division of NOAA within the Department of Commerce. *See* Fed. Defs.' Mot. Summ.

J. 3, ECF No. 38.

FMPs are subject to judicial review under Section 706 of the APA. *See* 16 U.S.C.

§ 1855(f)(1) (2012).

2.  The National Environmental Policy Act

The National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at scattered sections of U.S.C.), requires federal agencies to consider the environmental impact of "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(C) (2006).  FMPs and their amendments are considered major federal actions sufficient to trigger NEPA.  *See, e.g.*, *Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001).  "Before NMFS can approve an FMP amendment, NEPA requires the preparation of one of three levels of documentation based on the extent of the project's impact on the environment."  *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 101 (D.D.C. 2011) (citing 40 C.F.R. § 1501.4(a)–(b)).  The most detailed level of documentation, an environmental impact statement ("EIS"), is required for projects that significantly affect the environment.  *See id.* (citing 42 U.S.C. § 4332(C) and 40 C.F.R. § 1508.11).

To determine whether an EIS is required, the agency must first prepare an environmental assessment ("EA"), which provides evidence for determining whether there is sufficient environmental impact to trigger an EIS, or whether there is a finding of no significant impact ("FONSI").  *See Mineta*, 131 F. Supp. 2d at 22 (citing 40 C.F.R. §§ 1501.3, 1508.9(a)).  Following the EA, the agency either prepares an EIS or issues a FONSI report setting forth the reasons why the proposed action will not significantly impact the environment.  *See id.*  In either case, the agency must also consider alternatives to the proposed action.  *See id.*

An agency's compliance with NEPA is reviewable under Section 706 of the APA.  *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 90 (1983).

## B. The Omnibus Amendment

After NMFS updated the NS1 Guidelines to address the new requirements for ACLs and AMs set forth in the MSA amendment, the Mid-Atlantic Council drafted the Omnibus Amendment, which updates the FMPs for the six existing fisheries under the Council's jurisdiction: the Atlantic Mackerel, Squids, and Butterfish Fishery; the Atlantic Bluefish Fishery; the Spiny Dogfish Fishery; the Summer Flounder, Scup, and Black Sea Bass Fishery; the Surfclam and Ocean Quahog Fishery; and the Tilefish Fishery. *See generally* Omnibus Amendment, 76 Fed. Reg. 60,606 (Sept. 29, 2011) (codified at 50 C.F.R. pt. 648 (2013)) (A.R. 5197–213). On March 24, 2009, NMFS published a notice of intent, indicating that it was considering amendments to the six FMPs due to the new ACL and AM requirements. *See* Notice, 74 Fed. Reg. 12,314 (Mar. 24, 2009) (A.R. 172–74). After a round of scoping meetings, the Council drafted the Omnibus Amendment and submitted it to the Secretary, and in May 2011, NMFS published a notice in the *Federal Register* soliciting input on the Omnibus Amendment. *See* Request for Comments, 76 Fed. Reg. 29,717 (May 23, 2011) (A.R. 4663–64). The proposed rule was published on June 17, 2011, and the agency accepted public comment through July 22, 2011. *See* Proposed Rule, 76 Fed. Reg. 35,578 (June 17, 2011) (A.R. 4671–711). Initially, the agency was going to conduct an EIS, but it then changed the level of NEPA analysis to an EA. *See* Notice of Intent, 75 Fed. Reg. 11,129 (Mar. 10, 2010) (A.R. 1920–21). The agency then released a final EA that concluded with a FONSI. *See* A.R. 4754–5046. NMFS published the final Omnibus Amendment on September 29, 2011. *See* Omnibus Amendment, 76 Fed. Reg. at 60,606 (A.R. 5197).

The Omnibus Amendment sets ACLs and catch targets using a system of buffers. As noted above, the OFL is reduced to ABC to account for scientific uncertainty, and the Omnibus

Amendment contains "ABC control rules" delineating the method for computing the necessary reduction. *See* 50 C.F.R. § 648.20 (2013). The ACL for each managed stock is then set equal to the stock's ABC, except that for some stocks the ACL is apportioned into sector-ACLs, with separate catch limits for the commercial and recreational sectors. *See* Omnibus Amendment, 76 Fed. Reg. at 60,607 (A.R. 5198) ("The Council will recommend to NMFS ACLs set equal to ABC for all species, with some further subdivision to sector-level ACLs where stocks have pre-existing allocations for both commercial and recreational fisheries. The sum of these sector ACLs will be equal to the ABC.").

Although the ACL and ABC are equal under the Omnibus Amendment, the new regulatory scheme sets its target at an even lower figure in order to account for management uncertainty in the collection of data. This reduced figure is called an annual catch target ("ACT"), and is one type of AM established within the Omnibus Amendment to prevent the ACL from being exceeded. *See id.* ("Council staff . . . will review available information and recommend to the Council the amount of reduction from ACL to ACT necessary to address management uncertainty."). The ACTs are set in the first instance by committees, which propose specific ACTs to the Council and identify the specific sources of management uncertainty accounted for in their proposal. *See* 50 C.F.R. §§ 648.22, .71, .101, .121, .141, .161, .231, .291 (2013). "Management uncertainty may include late catch reporting, misreporting, and underreporting of catches and is affected by a fishery's ability to control actual catch." *Id.* § 600.310(f)(1).

One specific source of management uncertainty is the counting of bycatch, which under the Omnibus Amendment is estimated after each fishing year rather than counted in near real time during the season. *See* Omnibus Amendment, 76 Fed. Reg. at 60,612 (A.R. 5203) ("The

monitoring committees will consider the estimated discards for a given specification period . . . and recommend any necessary reductions for uncertainty associated with discard performance to the Council to establish ACT(s).").  The Omnibus Amendment does not itself purport to establish a methodology for reporting bycatch, and therefore relies largely on the methodology set forth in the SBRM Amendment.  The Omnibus Amendment, however, is not completely tied to the SBRM Amendment, as it authorizes the committees to make "[c]hanges, as appropriate, to the Northeast Region SBRM, including the coefficient of variation (CV) based performance standard, fishery stratification, and/or reports[,]" as part of the AMs for each FMP.  *Id.* at 60,617 (A.R. 5208).

The Secretary did not disapprove of the Omnibus Amendment, and the rules went into effect on October 31, 2011.  *See id.* at 60,606 (A.R. 5197).

### C.  Procedural History

On October 28, 2011, approximately one month after the Omnibus Amendment was published in the *Federal Register*, Oceana filed its complaint in the instant case, seeking vacatur of the Omnibus Amendment on five different theories:  (1) that NMFS's decision not to consider additional stocks for inclusion "in the fishery" violated the MSA, NEPA, and APA; (2) that NFMS violated the MSA and APA in failing to establish sub-ACLs and sub-AMs for bycatch species that are targets of other fisheries; (3) that NMFS violated the MSA, NEPA, and APA by delegating to committees the responsibility for quantifying management uncertainty and proposing ACTs; (4) that NMFS violated the MSA and APA by employing the SBRM Amendment's method of bycatch monitoring; and (5) that NMFS failed to establish sufficient

AMs under the MSA and APA by not adopting any other in-season bycatch monitoring system in the Omnibus Amendment.[2]  *See generally* Compl., ECF No. 1.

On February 24, 2012, FSF moved to intervene as a defendant on Counts II, IV, and V. *See* Mot. Intervene, ECF No. 21.  Neither Oceana nor Federal Defendants took a position on FSF's motion, and on March 2, 2012, the Court granted FSF leave to intervene on the three requested counts.  *See* Order, ECF No. 22.  The parties filed cross-motions for summary judgment as to all counts, and briefing was completed on February 22, 2013.

## III.  STANDARD OF REVIEW

Under the MSA, the Court reviews the implementation or amendment of a fishery management plan pursuant to the judicial review provisions set forth in chapter 7 of the APA. *See* 16 U.S.C. § 1855(f)(1)–(2) (2012).  Similarly, an agency's procedural compliance with NEPA is reviewed under the APA's "arbitrary and capricious" standard.  *See Nevada v. Dep't of Energy*, 457 F.3d 78, 87–88 (D.C. Cir. 2006).  *See generally Flaherty v. Bryson*, 850 F. Supp. 2d 38, 47 (D.D.C. 2012) ("Agency decisions under the Magnuson–Stevens Act and NEPA are reviewed pursuant to Section 706(2) of the APA.").

"Under the 'arbitrary and capricious' standard the scope of review is a narrow one." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).  On review, the Court gives the agency's decision "significant leeway" and does not substitute its own judgment for that of the agency.  *Steel Mfrs. Ass'n v. EPA*, 27 F.3d 642, 646 (D.C. Cir. 1994).  Instead, the Court will review the agency action in order to determine whether the agency has "articulate[d] a

---

[2] In its complaint, Oceana originally cast a wider net, asserting a broader array of theories.  *See generally* Compl., ECF No. 1  However, the theories were so narrowed in Oceana's summary judgment briefing.  *See generally* Pl.'s Mot. Summ. J., ECF No. 36; Pl.'s Reply Supp. Mot. Summ. J. 20, ECF No. 42; *infra* notes 7, 12, 17 and accompanying text.

'rational connection between the facts found and the choices made.'" *Bowman Transp.*, 419

U.S. at 285 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *accord*

*Kisser v. Cisneros*, 14 F.3d 615, 619 (D.C. Cir. 1994). The administrative record must show that

the agency "considered the relevant factors and explained the facts and policy concerns on which

it relied, and whether those facts have some basis in the record." *Nat'l Treasury Emps. Union v.*

*Horner*, 854 F.2d 490, 498 (D.C. Cir. 1988). Furthermore, the agency's decision is arbitrary or

capricious if the agency

> relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before [it], or is so implausible that it
> could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).

The review is to be based on the record that was before the agency at the time its decision

was made. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The Court "may not

supply a reasoned basis" that the agency itself has not given, but may "uphold a decision of less

than ideal clarity" if the agency's rationale may reasonably be discerned. *Bowman Transp.*, 419

U.S. at 285–86 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and *Colo. Interstate*

*Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 585 (1945)). The Court is merely to determine

whether the agency's decision was reasoned and supported by record evidence. *See State Farm*,

463 U.S. at 43.

The Court "will give an extreme degree of deference to the agency when it 'is evaluating

scientific data within its technical expertise.'" *Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C.

Cir. 1996) (quoting *Int'l Fabricare Inst. v. U.S. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (per

curiam)).  "When examining [a] scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive.").  Moreover, "[i]f carried out correctly, arbitrary-and-capricious style review does not put the court into the (agency's) driver's seat.  It is, rather, for the agency to decide the exact trade-off among conflicting goals that 'best promotes' the Congressional 'goal' in question."  *Cont'l Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451 (D.C. Cir. 1988).  Thus, in the context of judicial review of an FMP, "[i]t is therefore especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors."  *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).  Nonetheless, the courts applying the arbitrary and capricious standard of review "do not defer to the agency's conclusory or unsupported suppositions."  *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1186–87 (D.C. Cir. 2004).

Typically, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But when assessing a summary judgment motion in an APA case, "the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "The entire case on review is a question of law, and only a

question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). "In such a case, summary judgment merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). "Moreover, the party challenging an agency's action as arbitrary and capricious bears the burden of proof." *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

## IV. ANALYSIS

### A. Bycatch of Non-Target Stocks (Count I)

For each species of fish designated as a stock "in the fishery," the Council must develop conservation and management measures for that stock, including ACLs and AMs. *See* 16 U.S.C. § 1853(a) (2012); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 50 (D.D.C. 2012). In its first claim for relief, Oceana takes issue with the agency's failure to consider whether additional non-target stocks should be included "in the fishery" under the Omnibus Amendment. *See* Compl. ¶¶ 48–61, ECF No. 1. As the terms are used in the industry, a "stock of fish" is "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C. § 1802(42) (2012). A "target stock" is a stock that fishers seek to catch for sale or personal use. *See* 50 C.F.R. § 600.310(d)(3) (2013).[3] By contrast, "non-target stocks" are "fish caught incidentally during the pursuit of target stocks in a fishery . . . ." *Id.* § 600.310(d)(4).[4] For

---

[3] The term also includes "economic discards"—fish that are the target of a fishery, but that the fisher does not retain for economic reasons, such as undesirable size, sex, or quality. *See* 16 U.S.C. § 1802(9) (definition of "economic discards"); 50 C.F.R. § 600.310(d)(3) (definition of "target stocks").

[4] The term also includes "regulatory discards," which are harvested fish that fishers are required by regulation to either discard or retain but not sell. *See* 16 U.S.C. § 1802(38)

example, squids caught in the Atlantic Mackerel, Squids, and Butterfish Fishery are a target

stock. However, when river herring is incidentally caught as bycatch in the same fishery, river

herring is described as a non-target stock.[5] FMPs are required to include mechanisms for ACLs

and AMs for all stocks "in the fishery."[6] *See id.* § 600.310(c), (h).

When NMFS promulgated the Omnibus Amendment, it included provisions bringing

existing FMPs into compliance with the new requirements of the MSRA but did not include any

new stocks "in the fishery" for any of the existing FMPs. *See generally* Omnibus Amendment,

76 Fed. Reg. 60,606 (Sept. 29, 2011) (codified at 50 C.F.R. pt. 648 (2013)) (A.R. 5197–213). In

other words, under the Omnibus Amendment, the only stocks "in the fishery" are those that were

already managed under the then-existing FMPs. According to Oceana, NMFS's failure to

consider whether to include "in the fishery" non-target stocks not already managed in the

FMPs—such as river herring and shad within the Atlantic Mackerel, Squids, and Butterfish

Fishery—violates the MSA, NEPA, and APA.[7]

---

(definition of "regulatory discards"); 50 C.F.R. § 600.310(d)(4) (definition of "non-target stocks").

[5] It is important to note that "non-target stock" and "bycatch" are not totally synonymous, because the definition of bycatch includes economic discards while the definition of non-target stock does not. For example, river herring incidentally caught in the Atlantic Mackerel, Squids, and Butterfish Fishery constitute both bycatch and a non-target stock, because the herring are not the species sought by the fishers and are not retained for sale or personal use. An Atlantic mackerel caught in the same fishery but discarded due to unsatisfactory size would meet the definition of bycatch but would still be a target stock, because the species is sought by fishers in the fishery. *See* 16 U.S.C. § 1802(2), (9); 50 C.F.R. § 600.310(d)(3)–(4).

[6] Stocks "in the fishery" does not necessarily include ecosystem component species, which are non-target stocks unlikely to be subject to overfishing absent conservation and management measures. *See* 50 C.F.R. § 600.310(d)(5). Such species may, but are not required to, be included in an FMP. *See id.* § 610.310(d)(5)(iii).

[7] Although Oceana's complaint does not explicitly allege a violation of the MSA under Count I, *see* Compl. ¶ 61, it is clear that Oceana's claim rests on the theory that the agency acted arbitrarily and capriciously in its actions (and inactions) taken pursuant to both the MSA and NEPA.

### 1.  MSA Claim

The MSA requires the agency to create an FMP "for each fishery under its authority that requires conservation and management . . . ."  16 U.S.C. § 1852(h)(1) (2012).  According to Oceana, NMFS violated the MSA by failing to consider whether non-target bycatch species, such as river herring and shad, "require[] conservation and management" and therefore should have been "in the fishery" in the amended FMPs.  *See* Pl.'s Mot. Summ. J. 14–19, ECF No. 36.  Federal Defendants take the position that, because the Omnibus Amendment was intended solely to bring existing FMPs into compliance with new provisions of the MSA, they were not required to consider whether to include new stocks "in the fishery."  *See* Fed. Defs.' Mot. Summ. J. 14–21, ECF No. 38.  They also add that NMFS did, in fact, consider the effects of the proposed measures on non-target bycatch species that are not "in the fishery."  *See* Fed. Defs.' Reply Mem. Supp. Mot. Summ. J. 10–12, ECF No. 43.

### a.  *Piecemeal Compliance*

NMFS made clear at the outset that the purpose of its rulemaking here was "to address the new [MSA] requirements for annual catch limits (ACLs) and accountability measures (AMs) in an Omnibus Amendment to the fishery management plans (FMPs) for Atlantic mackerel, butterfish, Atlantic bluefish, spiny dogfish, summer flounder, scup, black sea bass, tilefish, surfclams, and ocean quahogs"—that is, the then-existing FMPs.  Notice, 74 Fed. Reg. 12,314 (Mar. 24, 2009) (A.R. 172).  From this, Federal Defendants reason that NMFS was not required to address *all* management needs in the Omnibus Amendment, and therefore could properly focus on bringing existing FMPs into compliance without considering whether to include new stocks "in the fishery."  *See* Fed. Defs.' Mot. Summ. J. 18.

Federal Defendants' argument is unavailing.  In support of their argument that an agency action is not invalid for failure to regulate more comprehensively, Federal Defendants rely largely on case law in which the D.C. Circuit held that it lacked jurisdiction to consider whether an agency's alleged failure to implement a statutory directive invalidated the regulation actually promulgated.  *See id.* (citing *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 287–88 (D.C. Cir. 1998), and *United Tech. Corp. v. EPA*, 821 F.2d 714, 720–21 (D.C. Cir. 1987)).[8]  But there is no jurisdictional dispute here.  In the cases Federal Defendants cite, the court lacked jurisdiction because the petitioner failed to fully implement the statutory goal in a single regulation, not because the agency ignored a factor that it was required to consider.  *See, e.g.*, *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 287–88 (D.C. Cir. 1998) ("Petitioner's basic argument is that the promulgated regulations 'fail to include necessary requirements' of the statute—not because the EPA ignored a factor that the statute requires it to consider, but only because it has not fully implemented the statutory goal.").

The issue raised by Oceana in challenging the Omnibus Amendment is different from the jurisdictional issues raised in the D.C. Circuit cases.  Oceana argues that, because NFMS did not consider whether to include non-target bycatch stocks "in the fishery," the Omnibus Amendment is arbitrary and capricious because the ACLs *it does set* for the already-managed stocks could result in overfishing of the unregulated bycatch stocks.  *See* Pl.'s Mot. Summ. J. 18; *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that an agency acts arbitrarily and capriciously if it "entirely failed to consider

---

[8] Federal Defendants also cite Judge Boasberg's opinion in *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95 (D.D.C. 2011), where the court found that, based on the narrow scope of the regulation at issue, it was reasonable under NEPA for NMFS to avoid inquiring whether to include any additional non-target bycatch species "in the fishery."  *See id.* at 125–28.  But because that analysis involved *NEPA*, the court did not address whether the narrow objectives of the new rule were at odds with the *MSA's* statutory mandates.

an important aspect of the problem"). The MSA's new provisions required NMFS to establish a mechanism for setting ACLs "at a level such that overfishing does not occur in the fishery . . . ." 16 U.S.C. § 1853(a)(15). And if the measures promulgated allow overfishing to occur, then "[a] future plan to comply with the MSA will not save an otherwise deficient FMP." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 122 (D.D.C. 2011).

Because the new provisions of the MSA required NMFS to establish a mechanism for specifying ACLs and AMs such that "overfishing does not occur in the fishery," the Court rejects Federal Defendants' argument that NMFS was not required to consider the Omnibus Amendment's impact on identified non-target bycatch species in the fisheries it chooses to manage under an FMP.

### b. Consideration of Bycatch Species Not "in the Fishery"

When Congress most recently reauthorized and expanded the MSA, it added a requirement that the Secretary "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery . . . ." Magnuson–Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, sec. 303(a), § 104(a)(10), 120 Stat. 3575, 3584 (2007) (codified at 16 U.S.C. § 1853(a)(15)). As Judge Kessler recently observed, implementation of ACLs to prevent overfishing under this provision "necessarily entails a decision as to which stocks require conservation and management."[9]

---

[9] Federal Defendants attempt to argue that *Flaherty* is inapplicable to this case because, there, NMFS originally considered whether to include additional stocks "in the fishery" and then abandoned that objective without explanation, making an "affirmative decision" not to include any new stocks. *See* Fed. Defs.' Reply Mem. Supp. Mot. Summ. J. 7 (citing *Flaherty*, 850 F. Supp. 2d at 45–46). The Court is not persuaded by this attempt to distinguish *Flaherty*. Federal Defendants cite only to the factual background section of the opinion, which merely describes the changing scope of NMFS's objectives in that case; Judge Kessler's actual analysis does not indicate that she considered the changing scope of the agency's objectives an important factor. *See Flaherty*, 850 F. Supp. 2d at 50–56.

*Flaherty*, 850 F. Supp. 2d at 52; *see also* 16 U.S.C. § 1852(h)(1) (requiring that each Council prepare an FMP "for each fishery under its authority that requires conservation and management"). Notably, however, the MSA does not adopt the "in the fishery" classification, nor does the text of Section 1853(a)(15) state that ACLs must be adopted for all species in need of conservation and management. Rather, the new provision requires only the establishment of ACLs and AMs such that overfishing does not occur. *See* 16 U.S.C. § 1853(a)(15). If bycatch of non-target stocks is considered in drafting ACLs for target stocks, then such consideration may suffice if the FMP does not result in the non-target stocks becoming subject to overfishing.

The Guidelines also support the conclusion that the MSA does not require reclassification of stocks "in the fishery" each time an FMP is amended. They contain no provision mandating that stocks be considered for reclassification whenever an FMP is amended. Instead, they provide for periodic monitoring "on a regular basis" to determine whether reclassification is necessary. *See* 50 C.F.R. § 600.310(d)(6).

Although NMFS did not consider whether to include non-target bycatch stocks "in the fishery," it did consider the impact of the Omnibus Amendment on those stocks. In the environmental assessment for the Omnibus Amendment, it was determined that, "[b]ecause [it] would not result in an increase or decrease in catch relative to ABC, the indirect impacts on the managed resource and non-target species are expected to be identical to those under the status quo . . . ." A.R. 4890. In other words, because the Omnibus Amendment sets ACL equal to ABC for all managed stocks, the agency rationally concluded that the changes to the existing FMPs would not have any greater detrimental impact on non-target bycatch species. *See* Omnibus Amendment, 76 Fed. Reg. at 60,607 (A.R. 5198). Oceana cites to no contrary evidence in the record that suggests that non-target bycatch stocks were subject to overfishing at the time

18

that determination was made. Instead, it relies on a single page from the administrative record that merely identifies hickory shad, blueback herring, American shad, and alewife as bycatch species in the Atlantic Mackerel, Squid, and Butterfish Fishery. *See* A.R. 4864. The cited evidence does not indicate that those bycatch stocks are subject to overfishing, and it does not contradict NMFS's findings as to the impact of the Omnibus Amendment on those stocks. *Cf. Flaherty*, 850 F. Supp. 2d at 53 (finding FMP amendment arbitrary and capricious for failing to explain why record evidence, cited by the plaintiffs, was insufficient to justify reclassification of river herring as a stock "in the fishery").

NMFS also argues that its decision not to consider additional stocks for inclusion "in the fishery" was reasonable in light of the time constraints imposed by the MSRA, *see* Fed. Defs.' Mot. Summ. J. 18, and the Court agrees. The statute imposes upon the agency an obligation to comply with the MSA's new provisions by the 2010 fishing year for fisheries that were subject to overfishing, and by 2011 for all others. *See* 16 U.S.C. § 1853 note. Although other judges have found that the MSRA's statutory deadline is no excuse for delay, *see Flaherty*, 850 F. Supp. 2d at 51–53, the Court finds that a holistic review of the timeline reveals that the agency did not act in a dilatory fashion. Before NMFS could begin amending the FMPs themselves, it first had to update the Guidelines in order to set forth the Secretary's interpretation of the MSA's new requirements for ACLs and AMs—a process that began just one month after the MSRA's enactment and concluded approximately two years later. *See* NS1 Guidelines Notice, 72 Fed. Reg. 7016 (Feb. 14, 2007); NS1 Guidelines Proposed Rule, 73 Fed. Reg. 32,526 (June 9, 2008); NS1 Guidelines Final Rule, 74 Fed. Reg. 3178 (Jan. 16, 2009) (codified at 50 C.F.R. pt. 600) (A.R. 102–38). These Guidelines set forth the framework that governs not just the Mid-Atlantic FMPs, but *all* FMPs nationwide. This warrants great care in their implementation. Given the

complexity of the Guidelines and fishery management generally, the Court finds the two-year timeline reasonable.

The time necessarily spent updating the Guidelines brought the agency much closer to its deadline. NMFS began the scoping process for the Omnibus Amendment shortly after completing the Guidelines updates, *see* Notice, 74 Fed. Reg. at 12,314 (A.R. 172), and produced a final amendment to all Mid-Atlantic FMPs within approximately two-and-a-half years. *See* Omnibus Amendment, 76 Fed. Reg. at 60,606 (A.R. 5197). Because during this time the agency was required to prioritize fisheries that were subject to overfishing—a category that included no Mid-Atlantic fisheries—the Court likewise finds that the agency spent a reasonable amount of time in reviewing the Omnibus Amendment.[10]

If the agency were required to make a wholesale reconsideration of which stocks to include "in the fishery" every time it amends an FMP, the delay would be much greater. Oceana articulates no stopping point on the number of species the agency would have to reconsider during each amendment, but any principled rule would presumably include all identified bycatch species, of which there are well over a dozen in the Mid-Atlantic FMPs. *See* A.R. 4864–65. To reassess the inclusion of these species "in the fishery" during each amendment would be an absurd result.[11] Indeed, Federal Defendants have noted that the delay would have a "crippling" effect on the agency. *See* Fed. Defs.' Mot. Summ. J. 20–21.

---

[10] Although FMPs are prepared by the Councils, and therefore the Mid-Atlantic Council would arguably not have been delayed by the requirement to prioritize fisheries that were subject to overfishing, the agency itself is charged with reviewing *all* FMPs. *See* 16 U.S.C. § 1854(a)(3) (2012).

[11] Oceana argues that, by not requiring NMFS to reassess the composition of the fishery during each amendment, the agency "could forever overlook the conservation and management needs of bycatch species in the Mid-Atlantic Fisheries and thereby continue to expose these stocks to overfishing." *See* Pl.'s Reply Supp. Mot. Summ. J. 8–9, ECF No. 42. But recent events show that Oceana's fear is unfounded. Before Oceana even initiated this litigation,

Because Oceana has not shown that NMFS's consideration of the Omnibus Amendment's impact on non-target bycatch species was arbitrary or capricious under the MSA, the Court will grant Federal Defendants' motion for summary judgment on Count I's MSA theory.

### 2. NEPA Claim

Count I of Oceana's complaint also contains a NEPA claim. "NEPA imposes procedural rather than substantive duties on government agencies undertaking major federal action, such as the adoption of an FMP or FMP amendment." *Locke*, 831 F. Supp. 2d at 124 (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193–94 (D.C. Cir. 1991)). "NEPA does not . . . 'require agencies to elevate environmental concerns over other appropriate considerations. . . . [I]t require[s] only that the agency take a hard look at the environmental consequences before taking a major action.'" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)) (second, third, and fourth alterations in original). Oceana argues that, by not considering whether to include non-target bycatch stocks "in the fishery," NMFS violated NEPA because it failed to take a "hard look" at the impacts of the Omnibus Amendment.[12] Federal Defendants argue that NMFS reasonably limited the scope of its analysis to the existing stocks in the fishery.

---

NMFS had already begun the scoping process for an amendment to the Atlantic Mackerel, Squids, and Butterfish FMP that would do more "to monitor and/or minimize the incidental catch of river herrings (blueback and alewife) and shads (American and hickory)"—the very species to which Oceana repeatedly points as justification for imposing a higher burden on the agency. *See* Amendment 14 Scoping Notice, 75 Fed. Reg. 32,745 (June 9, 2010). Days ago, the agency published a final rule that imposes heightened reporting requirements and allows the Council to set a cap on these species. *See* Amendment 14, 79 Fed. Reg. 10,029 (Feb. 24, 2014) (to be codified at 50 C.F.R. pt. 648) (effective Mar. 26, 2014).

[12] Oceana's Count I also alleges that NMFS failed to rationally consider whether an EIS was required, violating NEPA. *See* Compl. ¶¶ 58–59. But because Oceana does not invoke this

Other judges sitting in this district have previously recognized that, where the alleged NEPA violation involves NMFS's failure to consider whether to include additional stocks "in the fishery," the claim is better understood as a challenge to agency inaction. *See, e.g.*, *Locke*, 831 F. Supp. 2d at 125. "Rather than asserting that NMFS failed to take a hard look at the environmental consequences of its actions, therefore, [Oceana's] claim is more properly viewed as an allegation that NMFS improperly failed to consider *alternative* action to maintaining the status quo composition of the Fishery." *Id.*

Where a claim under NEPA is characterized in this manner, "the Court engages in a two-part process: first, an examination of 'whether an agency's objectives are reasonable,' and second, 'whether a particular alternative is reasonable in light of these objectives.'" *Id.* at 127 (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999)). The Court engages in both inquiries "with considerable deference to the agency's expertise and policy-making role." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).

The Court finds that NMFS acted reasonably in limiting the Omnibus Amendment to bringing existing FMPs into compliance with the new provisions of the MSA. As noted above, neither the MSA nor the Guidelines required that the composition of the fishery be reevaluated during the promulgation of the Omnibus Amendment. *See supra* Part IV.A.1.a. Where an issue is particularly complex, the scope of reasonable alternatives is necessarily limited. *See Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 241 (D.D.C. 2005) ("The duty to consider all such alternatives does not extend to situations where the possibilities are so numerous and the goals of the action so complex that the agency cannot possibly consider every significant alternative in a reasonable time period."). This is particularly true of fishery management, which courts have

---

theory in its briefing, and because APA cases are decided entirely on cross-motions for summary judgment, the Court will consider Oceana's EIS theory waived. *See also infra* Part IV.C.2.

recognized is "exceedingly complex." *Id.* at 242; *accord Locke*, 831 F. Supp. 2d at 127. This is especially so in light of the time constraints NMFS faced, as it was required to implement the new MSA provisions by 2011.

Because it was reasonable for the agency to limit the Omnibus Amendment's objectives to bringing FMPs for managed stocks into compliance with the MSA, the Court next turns to whether NMFS was required to consider an alternative that increased the number of managed species "in the fishery." Because such an alternative would not have furthered the objective of bringing existing FMPs into compliance with the MSA, the Court finds that the agency acted reasonably in declining to consider the alternative. The Court will thus grant summary judgment for Federal Defendants on Oceana's Count I NEPA theory.

## B. Bycatch of Target Stocks in Non-Directed Fisheries (Count II)

Oceana's second claim for relief challenges the Omnibus Amendment's alleged failure to account for bycatch of target stocks in non-directed fisheries. *See* Compl. ¶¶ 62–67, ECF No. 1. In this context, a "non-directed fishery" means a fishery managed by an FMP, but which does not seek to catch the target stock at issue. For example, the bycatch of summer flounder in the Northeast Multispecies Fishery (also known as the Groundfish Fishery)[13] falls within the scope of this claim, because summer flounder is a target stock of the Summer Flounder, Scup, and Black Sea Bass Fishery, but is a bycatch species in the Groundfish Fishery. *See id.* ¶ 65. During the Omnibus Amendment's comment period, Oceana recommended that NMFS address this issue by implementing "sub-ACLs"—that is, by apportioning the species' overall ACL among different user groups, including fisheries that catch the species as bycatch. *See* Omnibus Amendment, 76 Fed. Reg. 60,610–11 (Sept. 29, 2011) (A.R. 5201–02). It is Oceana's position

---

[13] The Groundfish Fishery is overseen by the New England Fishery Management Council. *See Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 102 (D.D.C. 2011).

that the Omnibus Amendment is arbitrary and capricious under the APA and Section 1853(a)(15) of the MSA, because it "does not reflect a rational analysis of the catch of target stock in non-directed fisheries and the implementation of sub-ACLs and [sub-]AMs for such catch, even though such issues were brought to [NMFS]'s attention in Oceana's Comment Letters."  Compl. ¶ 65.  Federal Defendants and FSF respond that the MSA does not require the implementation of sub-ACLs, and that, in any event, the Omnibus Amendment accounts for such bycatch in setting each species' overall ACL.  *See* FSF's Cross-Mot. Summ. J. 17–22, ECF No. 37; Fed. Defs.' Mot. Summ. J. 25–28, ECF No. 38.

Oceana correctly recognizes that sub-ACLs are not a mandatory measure, and that an FMP must simply establish an overall suite of accountability measures sufficient to prevent overfishing.  *See* Pl.'s Mot. Summ. J. 22, ECF No. 36 (citing *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 117 (D.D.C. 2011)).  Indeed, the MSA makes no mention of sub-ACLs.  *Cf.* 16 U.S.C. § 1853(a)(15) (2012) (requiring that the Secretary "establish a mechanism for specifying [overall] annual catch limits").  The issue is thus whether NFMS, by not implementing Oceana's sub-ACL proposal, acted arbitrarily and capriciously by ignoring bycatch of target stocks in non-directed fisheries.  *See also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that an agency acts arbitrarily and capriciously if it "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency").

Both the Guidelines and the administrative record show that bycatch of such stocks is not ignored, and that NMFS explained as much in declining to adopt sub-ACLs.  Under the NS1 Guidelines, ABC accounts for bycatch, either by expressing the ABC figure in terms of all catch, or expressing the figure in terms of landings while incorporating estimated bycatch and other

fishing mortality.  *See* 50 C.F.R. § 600.310(f)(3)(i) (2013).  Because the ACL for a stock cannot

exceed its ABC, *see id.* § 600.310(f)(5)(i), bycatch is thus included in the stock's overall ACL as

well.  Indeed, under the Omnibus Amendment, ABC and ACL are equal.  *See* Omnibus

Amendment, 76 Fed. Reg. at 60,607 (A.R. 5198).  The administrative record, including the

Omnibus Amendment's environmental assessment, demonstrates that the counted landings and

discard estimates for each stock are based on the figures from all fisheries, both directed and

non-directed, in setting the overall ACL.  *See* A.R. 1417, 4782; *see also* Omnibus Amendment,

76 Fed. Reg. at 60,611 (A.R. 5202) ("All managed species catch, regardless of whether the FMP

is a Mid-Atlantic, South Atlantic, New England, or Secretarial FMP, is fully accounted for under

the respective ACLs, irrespective of whether the catch is directed landings, dead discards in the

directed fishery, or dead discards incurred while targeting other species."); *id.* at 60,614 (A.R.

5205) ("[T]he Omnibus Amendment's system of accounting does, in fact, consider catch from all

directed fishery and other sources.").  Indeed, the NS1 Guidelines advise that stocks identified in

more than one fishery be regulated under a "primary FMP," and that conservation and

management measures for the stock in other FMPs be included under the primary FMP.  *See* 50

C.F.R. § 600.310(d)(7).  The administrative record shows that NMFS believed this approach was

more efficient for the Omnibus Amendment, explaining that sub-ACLs are not a cost-effective

mechanism in instances where the bycatch makes up only a small percentage of the overall catch

for that stock.  *See* Omnibus Amendment, 76 Fed. Reg. at 60,611 (A.R. 5202); *see also* A.R.

1418 (noting that another fishery uses sub-ACLs where bycatch is of a large magnitude, and

stating that "if there is a fishery that rises to the level of concern in that they're taking a large

percentage of the species incidentally, that [sic] we would consider some measure like maybe a sub ACL").[14]

In response to Defendants' showing that bycatch is accounted for, Oceana's reply brief moves the goalposts and asserts that accounting for bycatch in the overall ACL is insufficient because it does not *limit* bycatch.  *See* Pl.'s Reply Supp. Mot. Summ. J. 20, ECF No. 42. Instead, Oceana brushes aside the Omnibus Amendment's accounting system as merely "counting fish."  *See id.*  But the MSA requires only that the agency minimize bycatch "to the extent practicable . . . ."  16 U.S.C. § 1853(a)(11).  In phrasing the requirement in such a fashion, Congress delegated to the agency the discretion to weigh the relevant factors.  *See Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 141 (D.D.C. 2002) ("Congress, while aware of the potential conflicts among the [MSA]'s provisions, nevertheless 'required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards . . . .'" (quoting *Alliance Against IFQs v. Brown*, 84, F.3d, 343, 350 (9th Cir. 1996))).  Indeed, the National Standards require the agency to balance several competing considerations in developing FMPs, indicating that Congress did not intend that FMPs must limit bycatch to the greatest extent *possible*.  For example, National Standards 1, 7, and 9 require, respectively, that the agency balance optimum yield with conservation, minimize costs and avoid duplication, and minimize bycatch.  *See* 16 U.S.C. § 1851(a)(1), (7), (9) (2012).  The somewhat conflicting nature of these standards shows that Congress delegated to NMFS the discretion to strike an appropriate balance, and that there is no statutory mandate that one National Standard be maximized at the expense of others.  *See also Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084,

---

[14] As FSF points out, where bycatch makes up only a small percentage of the overall catch for a given stock, "the interlocking system of sub-ACLs Oceana prefers would virtually guarantee an essentially serendipitous series of shut-downs from year-to-year in other fisheries, thus inhibiting the attainment of OY in those fisheries."  FSF's Cross-Mot. Summ. J. 21.

1102 n.15 (9th Cir. 2012) ("The National Standards, and the MSA more generally, require NMFS to balance conservation with yield, not favor one at the expense of the other.").

The Court is similarly unconvinced by Oceana's argument that the Omnibus Amendment's accounting system does not establish a mechanism for specifying ACLs and AMs that prevent overfishing as required by Section 1853(a)(15) of the MSA. *See* Pl.'s Reply Supp. Mot. Summ. J. 20. If bycatch in non-directed fisheries is accounted for in a stock's overall ACL, which in turn has its own AMs, it seems that those measures would serve to prevent overfishing. Oceana has not demonstrated otherwise. Accordingly, the Court will grant summary judgment in favor of all Defendants on Count II.

### C. ACT Control Rule (Count III)

As noted above, the Omnibus Amendment employs annual catch targets, or ACTs, as one type of AM. An ACT is "an amount of annual catch . . . that is the management target of the fishery, and accounts for management uncertainty in controlling the annual catch at or below the ACL." 50 C.F.R. § 600.310(f)(2)(v) (2013). In other words, while the OFL is reduced by scientific uncertainty to establish the ACL of a stock, the ACL is further reduced by management uncertainty in order to establish the ACT for that stock. ACTs act as an AM because, by establishing catch targets below the ACL that account for management uncertainty, they help to ensure that the ACL is not exceeded. *See id.* An "ACT control rule" is "a specified approach to setting the ACT for a stock . . . such that the risk of exceeding the ACL due to management uncertainty is at an acceptably low level." *Id.* § 600.310(f)(2)(vi).

Under the ACT paradigm set forth in the Omnibus Amendment, "Council staff or species-monitoring committees will review available information and recommend to the Council the amount of reduction from ACL to ACT necessary to address management uncertainty.

Where ACLs are divided into sector-specific ACLs, comparable sector ACTs that address the associated sector-specific management uncertainties will be used." Omnibus Amendment, 76 Fed. Reg. 60,607 (Sept. 29, 2011) (A.R. 5198). The ACT control rule for each species is separately codified within the corresponding FMP. As set forth in the Omnibus Amendment, committees must recommend an ACT for each species—with some species further broken down by sector (commercial or recreational)—and identify the specific sources of management uncertainty considered in setting the ACT. *See* 50 C.F.R. §§ 648.22, .71, .101, .121, .141, .161, .231, .291 (2013).

> The Guidelines for National Standard 1 advise:
>
> If ACT is specified as part of the AMs for a fishery, an ACT control rule is utilized for setting the ACT. The ACT control rule should clearly articulate how management uncertainty in the amount of catch in the fishery is accounted for in setting the ACT. The objective for establishing the ACT and related AMs is that the ACL not be exceeded.

*Id.* § 600.310(f)(6). In Count III of its complaint, Oceana asserts that the Omnibus Amendment, which relies on the ACT as one type of AM, fails to comply with the MSA and APA because it does not specify a sufficient ACT control rule. *See* Compl. ¶¶ 74, 77, ECF No. 1. In the same Count, Oceana also challenges the Omnibus Amendment's alleged lack of a sufficient ACT control rule as a violation of NEPA, asserting that the agency failed to consider feasible and reasonable alternatives to the ACT AMs it did put in place, and did not take a hard look at the environmental impacts of those AMs. *See id.* ¶¶ 75, 77.

## 1. MSA Claim

Oceana first asserts that the Omnibus Amendment does not contain a sufficient ACT control rule and thus fails to comply with the MSA. *See id.* ¶ 74. In relevant part, the MSA requires that the Secretary of Commerce "establish a mechanism for specifying annual catch limits in the [FMP] at such a level that overfishing does not occur in the fishery, including

measures to ensure accountability." 16 U.S.C. § 1853(a)(15) (2012). The latter clause sets forth a statutory requirement that the agency adopt AMs in order to enforce the ACLs. *See Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 109 (D.D.C. 2011). The MSA does not specify what AMs are sufficient to satisfy this statutory requirement. The agency, however, has promulgated National Standards Guidelines to implement the MSA, and the NS1 Guidelines set forth advice as to the AMs that should be implemented under various circumstances.

Before analyzing the Guidelines themselves, the Court must first determine what weight the Guidelines are due. Where Congress delegates legally binding interpretive authority to an agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Here, however, the Guidelines do not carry the force of law and are therefore not automatically entitled to *Chevron* deference. *See* 16 U.S.C. § 1851(b) (2012) ("The Secretary shall establish advisory guidelines (*which shall not have the force and effect of law*), based on the national standards, to assist in the development of fishery management plans." (emphasis added)); *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (finding that tariff classification rulings by the Customs Service lacked the force of law and were therefore "beyond the *Chevron* pale"). Nonetheless, courts may afford some deference to a non-binding agency interpretation of its guiding statute depending on the facts and circumstances at hand—for example, based on the degree of the agency's thoroughness, consistency, formality, or expertise in issuing the interpretation. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for

guidance."); *see also Reno v. Koray*, 515 U.S. 50, 61 (1995) (formalities); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (consistency); *Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 390 (1984) (expertise); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976) (thoroughness).

The Court concludes that the NS1 Guidelines deserve considerable deference. NMFS used a highly formal process to amend the Guidelines to reflect the agency's interpretation of the MSA's new requirements for ACLs and AMs. The agency used notice-and-comment procedure to amend the Guidelines, publishing an initial notice in the *Federal Register* just one month after the MSRA was enacted. *See* NS1 Guidelines Notice, 72 Fed. Reg. 7016 (Feb. 14, 2007). NMFS accepted public comments during the scoping process, *see id.*, and after more than one year of deliberation, published a proposed rule for further comment, *see* NS1 Guidelines Proposed Rule, 73 Fed. Reg. 32,526 (June 9, 2008). It finalized the amendments to the Guidelines on January 16, 2009, approximately two years after the MSRA was enacted. *See* NS1 Guidelines Final Rule, 74 Fed. Reg. 3178 (Jan. 16, 2009) (codified at 50 C.F.R. pt. 600 (2013)) (A.R. 102–38). Over the years, NMFS has adopted a detailed and thorough Guideline for each of the ten National Standards, *see* 50 C.F.R. §§ 600.305–.355 (2013), which reflects the agency's expertise in the subject matter. Indeed, Oceana itself relies on the Guidelines in its briefing and does not appear to challenge their interpretation of the MSA. *See* Pl.'s Mot. Summ. J. 24–27, ECF No. 36.

The NS1 Guidelines support the agency's position that the ACT is not a mandatory AM under Section 1853(a)(15) of the MSA. The Guidelines identify the ACT as merely one of many types of in-season AMs that may be employed. *See* 50 C.F.R. § 600.310(g)(2). Rather than mandate the adoption of ACTs, the Guidelines state only that "ACTs are *recommended* in the

system of accountability measures so that ACL is not exceeded." *Id.* § 600.310(f)(2)(v) (emphasis added).

Nonetheless, NMFS did choose to implement ACTs as one type of AM in the Omnibus Amendment. Where an FMP uses ACTs, "an ACT control rule is utilized for setting the ACT."[15] *Id.* § 600.310(f)(6); *see also id.* § 600.310(f)(2)(vi) (defining ACT control rule). The Guidelines also provide some direction as to the content that should be contained in ACT control rules. In particular, in a provision relied upon heavily by Oceana, they provide that "[t]he ACT control rule should clearly articulate how management uncertainty in the amount of catch in the fishery is accounted for in setting ACT." *Id.* § 600.310(f)(6). According to Oceana, the Omnibus Amendment is invalid because it does not "clearly articulate" how the agency accounts for management uncertainty in arriving at the ACT. *See* Pl.'s Mot. Summ. J. 25–26, ECF No. 36. Instead, Oceana asserts that NMFS left itself unfettered discretion as to the method for setting ACTs, and even whether to set ACTs at all. *See id.* at 27.

The Court begins by noting that the Guidelines provide that the ACT control rule "*should* clearly articulate how management uncertainty in the amount of catch in the fishery is accounted for in setting ACT." *See* 50 C.F.R. § 600.310(f)(6) (emphasis added). Under the Guidelines, "[s]hould is used to indicate that an action or consideration is *strongly recommended* to fulfill the Secretary's interpretation of the Magnuson–Stevens Act, and is *a factor* reviewers will look for

---

[15] Although Oceana's complaint and briefing are not clear on this point, one could read Oceana's claim as asserting that NMFS did not implement *any* ACT control rule, and that a control rule is mandated by the NS1 Guidelines whenever ACTs are used. The Court reads the Guidelines differently. In recognizing that "an ACT control rule is utilized for setting the ACT[,]" 50 C.F.R. § 600.310(f)(6), NMFS was not imposing a separate substantive requirement upon FMPs that use ACTs. In view of the provision's lack of any language signifying obligation, *cf. id.* § 600.305(c)(1) (providing that the Guidelines use the word "must" to denote obligation to act), it is clear that this language in the Guidelines simply serves to *define* any rule establishing an ACT-setting approach as an "ACT control rule."

in evaluating a SOPP or FMP." *Id.* § 600.305(c)(3) (emphases added). By contrast, the Guidelines use the word "must" to denote obligations to act. *See id.* § 600.305(c)(1) ("Must is used, instead of 'shall', to denote an obligation to act; it is used primarily when referring to requirements of the Magnuson–Stevens Act, the logical extension thereof, or of other applicable law."). Thus, even assuming that the Omnibus Amendment's ACT control rules do fail to "clearly articulate" how management uncertainty is accounted for in setting the ACT, such detail is not required in order to comply with the MSA.[16] *See also Locke*, 831 F. Supp. 2d at 117 (finding that sub-AMs are not mandatory when sub-ACLs are used in an FMP, even though the Guidelines provide that sub-AMs "should" accompany sub-ACLs).

Because the ACT itself is not a mandatory AM, and because the NS1 Guidelines do not mandate that any specific content be included in the ACT control rule when ACTs are employed, the ultimate inquiry under Section 1853(a)(15) of the MSA is whether NMFS established an *overall suite* of AMs to prevent overfishing. *See id.* As Federal Defendants point out, the

---

[16] Nor is Oceana sufficiently specific about what it thinks a "clear articulation" would entail. Both the Guidelines and the Omnibus Amendment's ACT control rules require that the committees consider and identify sources of management uncertainty, including uncertainty in the ability of managers to constrain catch and uncertainty in quantifying true catch amounts. *See* 50 C.F.R. § 600.310(f)(6)(i). Perhaps Oceana believes a rigid mathematical formula is required or recommended—it does not say.

This case is not like *Oceana, Inc. v. Locke*, 670 F.3d 1238 (D.C. Cir. 2011), which Oceana points to. In that case, the D.C. Circuit found that NMFS failed to comply with a statutory mandate that it establish a standardized bycatch reporting methodology. *See id.* at 1241. There, the agency left itself discretion to depart entirely from its SBRM reporting duties based on a vaguely defined exception. *See id.* Here, the Omnibus Amendment's ACT control rules contain no such escape hatch.

The SBRM case is also distinguishable on the basis that, by failing to "establish" a sufficient methodology, NMFS violated its *statutory duty* under the MSA. *See* 16 U.S.C. § 1853(a)(11). Here, by contrast, Oceana argues that the agency left itself too much discretion in executing a *recommended* AM. Oceana has not argued that the overall suite of AMs in the Omnibus Amendment fails to "establish" AMs as required by the MSA. *See id.* § 1853(a)(15). Such a theory may have been analogous to the SBRM case—the Court need not decide, because Oceana has not presented the issue here.

Omnibus Amendment uses ACTs alongside several other AMs, such as commercial trip and possession limits, and overage repayments. *See* Omnibus Amendment, 76 Fed. Reg. at 60,607 (A.R. 5198). Oceana, in both its complaint and its briefing, chose to focus narrowly on NMFS's alleged failure to adopt a sufficient ACT control rule, ignoring the other AMs that are in place. In failing to show that the AMs in place are insufficient to ensure accountability, and instead describing as mandatory AM components that are not so, Oceana has not met its burden of demonstrating the Omnibus Amendment's non-compliance with the MSA. *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc) ("[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." (citing *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 746 F.2d 1492, 1502 (D.C. Cir. 1984))). The Court will therefore enter judgment in favor of Defendants as to Oceana's Count III MSA claim.

## 2. NEPA Claim

Oceana has also claimed that the agency violated NEPA in its alleged failure to take a hard look at the alternatives to, and environmental impacts of, the Omnibus Amendment's mechanism for specifying ACTs. *See* Compl. ¶¶ 75, 77. However, in its briefing, Oceana does not present any argument or citation in support of its NEPA theory on Count III. In a case based solely on judicial review of agency action, the district court sits as an appellate tribunal and disposes of the case on cross-motions for summary judgment. *See Locke*, 831 F. Supp. 2d at 106 ("In such a case, summary judgment merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the

APA, the district judge sits as an appellate tribunal."); *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("The entire case on review is a question of law, and only a question of law."). Thus, a plaintiff's failure to raise arguments or theories in its motion for summary judgment results in waiver of those arguments. *See EMILY's List v. FEC*, 569 F. Supp. 2d 18, 25 n.6 (D.D.C. 2008), *rev'd on other grounds*, 581 F.3d 1 (D.C. Cir. 2009); *see also New York v. U.S. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (per curiam) (finding waiver in petitioner's failure to raise argument in its opening brief). Accordingly, the Court will consider Oceana's NEPA theory waived as to Count III.

### D. Use and Sufficiency of the SBRM (Count IV)

In Count IV of its complaint, Oceana challenges the Omnibus Amendment's alleged use of the SBRM as a bycatch reporting methodology, arguing that the FMPs' alleged use of the SBRM fails to provide the NMFS with timely, accurate, and precise enough information to meaningfully enforce ACLs. *See* Compl. ¶¶ 78–90, ECF No. 1. The SBRM is not established by the Omnibus Amendment itself, but was instead established by the SBRM Amendment, a separate rule, promulgated earlier by the NMFS in cooperation with the councils for the New England and Mid-Atlantic regions. *See* SBRM Amendment, 73 Fed. Reg. 4736 (Jan. 28, 2008) (codified at 50 C.F.R. pt. 648 (2013)). The SBRM Amendment requires the NMFS to place enough independent observers within each "fishing mode"—that is, combination of vessel type and fishing gear—to gather statistically reliable data on bycatch. *See id.* at 4738.

However, the SBRM Amendment is no longer in effect. In 2011, the D.C. Circuit ordered that the rule be vacated and remanded to the agency because it failed to comply with the MSA's requirement that the NMFS "establish" a standardized reporting methodology to assess the amount and type of bycatch. *Oceana, Inc. v Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011);

*see also* 16 U.S.C. § 1853(a)(11) (2012). The rule left the agency an escape hatch "[i]n any year in which external operational constraints would prevent NMFS from fully implementing the required at-sea observer coverage levels," *see* SBRM Amendment, 73 Fed. Reg. at 4738, and the court found that this gave the agency "complete discretion to determine when an external operational constraint prevents [it] from fully implementing the required coverage levels." *Oceana*, 670 F.3d at 1241 (alteration in original) (internal quotation marks omitted). The agency is still promulgating a new rule pursuant to the remand. *See* Notice and Request for Comments, 78 Fed. Reg. 69,391 (Nov. 19, 2013) (opening a comment period through December 19, 2013).

Federal Defendants argue that, because the SBRM Amendment has already been vacated and remanded, the Court can provide no further relief to Oceana. *See* Fed. Defs.' Mot. Summ. J. 33–34, ECF No. 38. Oceana counters that the continued use of the SBRM is arbitrary and capricious, citing general case law on the arbitrary and capricious standard. *See* Pl.'s Omnibus Reply Br. 26, ECF No. 42. Defendants have the better argument here. As Judge Boasberg found in ruling on Oceana's challenge to an amendment to the New England FMPs, the sufficiency of the SBRM "is the very question being litigated in a separate case involving the SBRM Amendment." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 114 (D.D.C. 2011). Like Amendment 16 at issue in that case, the Omnibus Amendment itself does not purport to establish a bycatch reporting methodology, and Oceana's claim thus rests on the SBRM Amendment itself. Because the SBRM Amendment has been vacated and remanded to the agency, there is no further remedy the Court can provide. *See id.* ("No matter the grounds for Oceana's present challenge to the Multispecies FMP's standardized bycatch-reporting methodology, this Court can provide no further relief because the SBRM Amendment has already been remanded.").

To the extent Oceana wishes to challenge the new methodology resulting from the remand, it must wait until the issue is ripe for adjudication. As noted, the agency is still in the rulemaking phase. Because the Court can provide no further relief under the theory outlined in Count IV of the complaint, the Court will also dismiss this count.

### E. In-Season Bycatch Monitoring Measures (Count V)

Oceana's fifth and final claim asserts that, by declining to adopt in-season bycatch monitoring, NMFS failed to establish sufficient AMs under Section 1853(a)(15) of the MSA.[17] *See* Pl.'s Mot. Summ. J. 28–29, ECF No. 36. Defendants take the position that the MSA does not require NMFS to monitor in-season bycatch in near real time. The MSA requires the Secretary to "establish a mechanism for specifying annual catch limits in the [FMP] at such a level that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15) (2012). As the Court has already noted, the latter clause requires the Secretary to implement AMs to enforce ACLs. *See supra* Part IV.C.1 (citing *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 109 (D.D.C. 2011)). The MSA itself is not specific as to the AMs it requires, and so the Court, applying the doctrine of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), again views the NS1 Guidelines with considerable deference. *See supra* Part IV.C.1 (applying *Skidmore* to the NS1 Guidelines).

Neither the MSA nor the Guidelines support Oceana's assertion that NMFS was required to implement in-season bycatch monitoring. Section 1853(a)(15) of the MSA broadly mandates that the Secretary implement AMs, and does not specifically mention in-season bycatch

---

[17] Oceana's complaint asserted a broader claim, alleging that the Omnibus Amendment failed to establish *any* bycatch reporting methodology, violating Section 1853(a)(5), (11), and (15) of the MSA. *See* Compl. ¶¶ 91–95, ECF No. 1. However, Oceana relies solely on its in-season bycatch monitoring theory under Section 1853(a)(15) in its briefing, thus waiving the remaining theories it originally asserted. *See also supra* Part IV.C.2.

monitoring—or bycatch at all.[18]  *See* 16 U.S.C. § 1853(a)(15); *see also Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 109 (D.D.C. 2011) ("Nothing in the statute's text compels the conclusion that 'measures to ensure accountability' with ACLs required by § (a)(15) must also, by themselves, meet the requirements of § (a)(11).").  The NS1 Guidelines, which interpret the MSA's mandate that the Secretary balance optimum yield with conservation and management in the establishment of ACLs and AMs, provide only that "*[w]henever possible*, FMPs should include inseason monitoring and management measures to prevent catch from exceeding ACLs." 50 C.F.R. § 600.310(g)(2) (2013) (emphasis added).  Thus, although they are highly recommended, in-season AMs (and in-season bycatch monitoring, specifically) are not mandatory.

Oceana cites to *Locke* for the proposition that "ACL monitoring . . . requires in-season bycatch reports that measure discards in near real time . . . ."  *Locke*, 831 F. Supp. 2d at 109.  But as FSF points out, Judge Boasberg was citing to the administrative record in that case, not to law, indicating that the quoted language relates to the requirements of the specific FMP at issue in that case.  *See* FSF's Cross-Mot. Summ. J. 27–28, ECF No. 37-1; *see also* Fed. Defs.' Mot. Summ. J. 36–37, ECF No. 38.  *See generally* Amendment 16, 75 Fed. Reg. 18,262 (Apr. 9, 2010) (codified as amended at 15 C.F.R. pt. 902 and 50 C.F.R. pt. 648 (2013)) (detailing weekly vessel trip reporting requirements imposed by the amendment).  This case relates to the fisheries within the jurisdiction of the Mid-Atlantic Council, whose FMPs do not explicitly require "in-season

---

[18] Section 1853(a)(11), which Oceana originally asserted in Count V and then waived, *see supra* note 17, requires that the Secretary "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery," 16 U.S.C. § 1853(a)(11), but likewise does not explicitly state that the methodology must use in-season measures.  Moreover, as the Court noted above, NMFS is in the process of reissuing a standardized bycatch reporting methodology on remand, following the D.C. Circuit's rejection of the SBRM Amendment.  *See supra* Part IV.D.

bycatch reports that measure discards in near real time"—not the New England FMPs at issue in *Locke*.

Because near-real-time in-season bycatch monitoring is not mandatory, the ultimate issue of the Omnibus Amendment's compliance with the MSA rests on whether the overall suite AMs is sufficient to enforce the ACLs. *See also supra* Part IV.C.1. Defendants do not deny that some form of accounting for bycatch, whether in-season or post-season, is an important component in the overall suite. In the Omnibus Amendment's final publication in the *Federal Register*, NMFS stated:

> In lieu of monitoring total catch on a real-time basis, the Omnibus Amendment contemplates a two-part examination of the fisheries: Inseason monitoring of landings . . . *and post-fishing year accounting of dead discards*. The monitoring committees will consider the estimated discards for a given specification period . . . and recommend any necessary reductions for uncertainty associated with discard performance to the Council to establish ACT(s).

Omnibus Amendment, 76 Fed. Reg. 60,612 (Sept. 29, 2011) (A.R. 5203) (emphasis added). NMFS acknowledged that the post-season estimation method "contains some uncertainty, particularly if the discard estimates utilized to offset the ACT or to derive the landing limits before the fishery occurs are variable." *Id.* But this is accounted for in the management uncertainty in setting the ACT, and thus the ACTs and post-season bycatch estimation go hand-in-hand.

Oceana asserts that post-season estimates will not generate precise enough data to meaningfully enforce ACLs. *See* Pl.'s Mot. Summ. J. 29. But this assertion is unsupported by evidence or data. Instead, Oceana focuses exclusively on the alleged need for in-season monitoring without explaining why NMFS's chosen alternative was arbitrary and capricious. Although the method of using post-season bycatch estimates to create an ACT "buffer" in lieu of real-time monitoring contains inherent uncertainty, *see* Omnibus Amendment, 76 Fed. Reg. at

60,612 (A.R. 5203), the availability of corrective AMs such as overage adjustments in subsequent fishing years, *see* 50 C.F.R. § 600.310(g)(3), makes NMFS's choice appear reasonable.  While near-real-time bycatch monitoring may lead to more reliable data in theory, NMFS explained that it lacked the resources to undertake such a measure.  *See* Omnibus Amendment, 76 Fed. Reg. at 60,612 (A.R. 5203).  Oceana does not directly challenge this reasoning, but instead asserts that its own preferred AM is superior.[19]  Upon review of an agency action, "[o]nce assured the [agency] has engaged in reasoned decisionmaking, it is not for [the Court] to reweigh the conflicting evidence or otherwise substitute [its] judgment for that of the [agency]."  *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995).  This is particularly true when the agency is using scientific and technical expertise and balancing its resources.  *See Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996).

Because Oceana has not shown that NMFS acted arbitrarily and capriciously in deciding not to adopt in-season bycatch monitoring measures, the Court will enter judgment in favor of Defendants as to Count V.

## V.  CONCLUSION

For the foregoing reasons, the Court will deny Oceana's motion for summary judgment, and grant Defendants' motions for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 10, 2014

RUDOLPH CONTRERAS
United States District Judge

---

[19] In response, Oceana quotes *Locke* for the proposition that "[s]tatutory requirements that render fishery management more difficult or expensive, may not simply be disregarded." *Locke*, 831 F. Supp. 2d at 121, *quoted in* Pl.'s Mot. Summ. J. 29.  However, as noted above, in-season monitoring is not mandatory under the MSA or NS1 Guidelines.